# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Savannah Division

FILED
at 11 O'clock & 24 min A M
Date 6/13/07

Samuel L. Kay, Clerk
United States Bankruptcy Court
Savannah, Georgia

| | | |
|---|---|---|
| In the matter of: | ) | |
| | ) | Chapter 12 Case |
| KURT E. GRAHAM | ) | |
| | ) | Number 07-40427 |
|       *Debtor* | ) | |
| | ) | |
| and | ) | |
| | ) | |
| | ) | Chapter 12 Case |
| GRAHAM FORESTRY, INC. | ) | |
| | ) | Number 07-40428 |
|       *Debtor* | ) | |

## MEMORANDUM AND ORDER
## ON THE BANK OF NEWINGTON'S
## MOTION FOR RELIEF FROM THE AUTOMATIC STAY

The Bank of Newington (the Bank) has filed a Motion for Relief from the Automatic Stay in each of the above Chapter 12 cases. *See* Case No. 07-40427, Dckt. No. 11 (March 29, 2007); Case No. 07-40428, Dckt. No. 8 (March 29, 2007). After consideration of the evidence presented and the arguments of counsel at the consolidated hearing held in this matter on May 21, 2007, the Court hereby enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

This case involves an individual, Debtor Kurt Graham, and two related but separate entities, Debtor Graham Forestry, Inc. (Graham Forestry) and Graham Farms, Inc.

AO 72A
(Rev. 8/82)

(Graham Farms). Kurt Graham filed a voluntary petition for relief under Chapter 12 of the Bankruptcy Code on March 22, 2007. Graham Forestry also filed a voluntary petition for relief under Chapter 12 on March 22, 2007. For the sake of clarity, it is important to note that Graham Farms has not filed a bankruptcy petition and is not a debtor. Therefore, when I use the phrase "Debtors" in this memorandum and order, I am referring only to Kurt Graham and Graham Forestry.

The assets of both Debtors have been commingled to such an extent that it is impossible to make any distinction between Kurt Graham and Graham Forestry. Kurt Graham has admitted that assets were commingled and that he had operated the personal and family finances as one entity. Graham Forestry is the alter ego of Kurt Graham, and the Debtors have filed a motion to consolidate the above bankruptcy cases.

The Debtors are indebted to the Bank in the total sum of $165,857.98 as of March 22, 2007, as evidenced by the proof of claim filed by the Bank in the bankruptcy case of Kurt Graham. See Case No. 07-40427, Dckt. No. 69, Ex. 3 (May 21, 2007).[1] The Bank's claim is secured by perfected security interests in all of the Debtors' equipment including, but not limited to, machinery, vehicles, furniture, fixtures, manufacturing equipment, farm machinery and equipment, shop equipment, office and record keeping equipment, parts and

---

[1] The Bank also filed a proof of claim in the case of Graham Forestry in the amount of $22,224.48. See Case No. 07-40427, Dckt. No. 69, Ex. 2 (May 21, 2007). Kurt Graham personally guaranteed the obligations of Graham Forestry to the Bank, and the amount of the proof of claim filed by the Bank in the Graham Forestry case is included in the proof of claim filed by the Bank in the case of Kurt Graham. See Id., Ex. 3.

tools. *See* Id., Ex. 3. The Bank's collateral (the Collateral) includes, without limitation, the following specific items of farm equipment:

(a) John Deere Model 7800 tractor (Serial #RW7800H007460);
(b) John Deere Model 8310 Tractor (Serial #RW831OPO12176);
(c) Case International Model 1680 Axial Flow Combine (Serial #JJC0118349);
(d) Case International Model 1020 Grain Header (Serial #JJC0222258);
(e) Case International Model 1064 Corn Header (Serial #JJC0069160);
(f) Newton Crouch Fertilizer Spreader (Serial #10931951);
(g) Pittsburg 6-row Cultivator;
(h) Powell Cole 6-row Twin Sevens Planter with KMC Spider Ripper (Serial #24921);
(i) 2001 Polaris 4-wheeler (Serial #A01CH50AA);
(j) 2003 KMC Model 3376 Peanut Combine with Spreader (Serial #69945);
(k) Set of Flotation Tires and Wheels for 1680 Combine;
(l) 1991 Peterbilt Tractor (Serial #1XP9D29X6FD181659);
(m) 40' Peanut Trailer (Serial #FHX670706);
(n) 1968 Gindy Trailer (Serial #43436);
(o) 1980 Monon Van (Serial #46724);
(p) Two Peerless Peanut Dryers (Serial #N2530003SDRD & N2530023SDSD);
(q) KMC Peanut Digger (Inverter) (Serial #71201);
(r) KMC Dump Cart (Serial #71201);
(s) 15' Great Plains Drill, Model 1500 (Serial #0684C);
(t) KMC Peanut Reshaker (Serial #72049);
(u) 20' KMC Field Cultivator (Serial #23863);
(v) Harrell 6-plow Switch Plow;
(w) 27' John Deere 630 Harrow (Serial #N00630X012574);
(x) 60' LMC Sprayer;
(y) 6-row Under-Furrow Strip-Till Rig; and
(z) Spray-Till Planter w/7100 Planters.

Deere & Company has a first-in-priority security interest in the 2003 KMC Model 3376 Peanut Combine with Spreader; the KMC Peanut Inverter; and the KMC Dump Cart (collectively, the Deere & Company Collateral), as evidenced by its proof of claim for $56,146.17 filed in this case. See Id., Ex. 13.

The Bank has a first-in-priority security interest in all of the Collateral except the Deere & Company Collateral. The Bank has a second-in-priority security interest in the Deere & Company Collateral. The Debtors and the Bank have stipulated that the Debtors have no equity in the Collateral. The John Deere Model 7800 Tractor has a blown motor and will cost approximately $8,000.00 to $10,000.00 to repair, and it is inoperable without being repaired.

Although they were included with the Collateral that had been pledged as security by the Debtors, the 1968 Gindy Trailer, the 1980 Monon Van, and the Two Peerless Peanut Dryers (collectively, the Converted Collateral) were sold by Graham Farms to Ogeechee Peanut Company on March 24, 2006, for the sum of $18,000.00. See Id., Ex. 10. Kurt Graham signed the bill of sale on behalf of Graham Farms warranting that there were no liens on the Converted Collateral. See Id. The sale proceeds received from Ogeechee Peanut Company were deposited by Kurt Graham into the checking account of Graham Farms at the Citizens Bank of Effingham on March 28, 2006.

A portion of the Collateral owned by the Debtors was purportedly insured by Grange Mutual Casualty Company under Policy Number FO 2325218-00. *See* Id., Ex. 16. However, the named insured under that policy is Graham Farms. The term of that insurance policy expired on May 26, 2007, and the renewal premium has not been paid. The only equipment insured under the policy was the John Deere Model 8310 Tractor, the John Deere Model 7800 Tractor, and the Case International Model 1680 Combine. There is no insurance coverage on the remaining Collateral despite language in the security agreements that requires coverage on all collateral. *See, e.g.*, Id., Ex. 4, p. 2 ("Debtor agrees to keep the Property insured against the risks reasonably associated with the Property until the Property is released from this Agreement. Debtor will maintain this insurance in the amounts Secured Party requires.").

Kurt Graham has filed a motion to sell a portion of the Collateral, which is currently pending before this Court. *See* Id., Ex. 14. Those items proposed for sale include the following:

   (a) Newtown Crouch Fertilizer Spreader
   (b) Pittsburgh 6 Row Cultivator
   (c) Harrell 6-Plow Switch Plow
   (d) Powell Cole 6-Row Twin Stevens Planter w/KMC Spider Ripper
   (e) 6 Row Stip Till
   (f) KMC Peanut Reshaker
   (g) 20' KMC Field Cultivator

## CONCLUSIONS OF LAW

A court may grant relief from the automatic stay "with respect to a stay of an act against property under subsection (a) of this section, if (A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2). As for the first element of this provision, the parties agree that the Debtors do not have any equity in the Collateral.

The second element requires "not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect." United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 375-76, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Also, "there must be a reasonable possibility of a successful reorganization within a reasonable time." Id. at 376 (quotations omitted).

Kurt Graham filed a Summary of Operations (the Summary) in his bankruptcy case on April 24, 2007. See Case No. 07-40427, Dckt. No. 69, Ex. 17 (May 21, 2007). The Summary indicates that Kurt Graham had a negative net income for the previous crop year of $178,032.53. Kurt Graham also had a net loss for crop year 2005. The Summary proposes the planting of 110 acres of corn and 110 acres of soybeans during the 2007 crop year on 220 acres of rented land. Because it is too late to plant corn for the 2007 crop year, he now proposes to plant peanuts in lieu of corn.

The Summary projects total estimated proceeds for all crops to be $107,250.00 for crop year 2007 with total estimated operating expenses of $43,370.00, resulting in a net operating income of $63,880.00. Although the projected net operating income represents a 59.6% profit margin, the Bank demonstrated at the hearing that the Summary's itemized estimated operating expenses are infeasible.

The estimated expense for fuel is $1,800.00. At the current price of $3.00 per gallon, this allows for only 600 gallons of fuel for the entire crop year. Kurt Graham admitted at the hearing that this figure could have been underestimated. The estimated expense for electrical and phone bills is $5,000.00. Kurt Graham testified that the entire 220 acres is under irrigation, and his crop consultant projected a utility cost of $50.00 per acre to operate the irrigation system. On 220 acres, this expense would amount to $11,000.00.

Estimated expenses for repairs are only $1,000.00. The equipment dealer presented by Kurt Graham as an expert witness testified that routine maintenance on the Collateral could cost between $8,000.00 and $10,000.00 per year. In addition, Kurt Graham himself admitted that it may cost another $6,000.00 to $8,000.00 to repair the John Deere Model 7800 Tractor with a blown engine.

The Summary's estimated expenses do not include any amount for crop insurance, and Kurt Graham testified that he could no longer obtain crop insurance for the 2007 crop. Therefore, he intends to farm this year without the safety net provided by crop

insurance. Furthermore, estimated expenses do not include any other kind of insurance. Kurt Graham did not know the renewal premium on the insurance policy issued by Grange Mutual Casualty Company, but the annual premium for the existing policy, which expired on May 26, 2007, was $2,200.00.

Estimated expenses for land rent is $6,000.00. However, Kurt Graham testified that he has agreed to pay $65.00 per acre as land rent for the 220 acres to be rented from his family. Therefore, the expense for land rent is at least $14,300.00.[2] When apprised of this discrepancy at the hearing, Kurt Graham admitted that the Summary's estimated expense for land rent was incorrect. Furthermore, the Summary does not include estimated expenses for hired labor. At the hearing, Kurt Graham testified that he would perform all labor on the 220 acres by himself.

On the income side, Kurt Graham has proposed the planting of peanuts instead of corn, even though the production cost for peanuts can be higher than the production cost for corn. The Debtors have not yet planted any soybeans or peanuts for 2007, even though the optimum planting period for soybeans ended on June 10, 2007, and planting soybeans after that date will result in diminished yields and a decline in crop quality. *See* Case No. 07-40427, Dckt. No. 68 (May 21, 2007) (testimony of Thomas Kessler,

---

[2] Kurt Graham produced a lease agreement at the hearing, which provides for his lease of 553.8 acres of land from his family. *See* Case No. 07-40427, Dckt. No. 69, Ex. 25 (May 21, 2007). The amount of acreage set forth in this lease exceeds the 220 acres shown on the Summary. *See* Id., Ex. 17. Kurt Graham also testified that the agreed land rent under the lease for 2007 was $30,000.00 and that approximately $10,000.00 of this amount had already been paid to his uncle, Carey Graham.

agricultural consultant). Late planting will also increase the risk of frost damage in the fall. Furthermore, the optimum planting period for peanuts expired on May 25, 2007. *See* Id. Planting peanuts after that date will result in diminished yields and a decline in crop quality. Late planting will also increase the risk of frost damage in the fall.

Based on these findings, the Summary's total estimated operating expenses are understated within a range of approximately $27,300.00 to $33,500.00. In light of the heavy losses incurred by Kurt Graham in the previous years, I conclude that actual operating expenses will likely reach the high end of that range. Coupled with the fact that delayed planting will reduce the income potential, the Summary's underestimated and unknown expenses results in a doubtful profit for 2007. Compounding matters, at his meeting of creditors, Kurt Graham testified that he had previously told the Bank that he did not see much of a future in row cropping, where the profit margin is small even under the best circumstances. *See* American Network Leasing, Inc. v. Apex Pharm., Inc. (In re Apex Pharm., Inc.), 203 B.R. 432, 443 (N.D. Ind. 1996) ("[A] debtor's prior performance is probative evidence of the feasibility of a plan of reorganization, especially where a primary creditor has worked closely with the debtor in an attempt to encourage greater cash flow."); NationsBank, N.A. v. LDN Corp. (In re LDN Corp.), 191 B.R. 320, 325-26 (Bankr. E.D. Va. 1996); Kimbrough Inv. Co. v. Royal d'Iberville Corp. (In re Royal d'Iberville Corp.), 10 B.R. 37, 38 (Bankr. S.D. Miss. 1981). As a result, I conclude that there does not exist a reasonable possibility that the Debtors can achieve successful Chapter 12 reorganizations within a reasonable time. *See* Timbers, 484 U.S. at 376.

Furthermore, Kurt Graham's affairs are in shambles and his credibility is questionable. *See* United States v. Garm (In re Garm), 114 B.R. 414, 417 (Bankr. M.D. Pa. 1990) (granting creditor's request for stay relief after concluding, *inter alia*, that the debtor's testimony concerning property valuation was not credible). He has created such a confusing web of transactions that his true relationship with and interest in the non-debtor Graham Farms is difficult to ascertain. For example, he deposited checks payable to Kurt Graham into the accounts of Graham Farms, and thereby commingled property. *See* Case No. 07-40427, Dckt. No. 69, Exs. 18-21 (May 21, 2007). Furthermore, on his Schedule B, he listed 54.2 acres of sod and noted that it was owned by Graham Farms, *see* Id., Ex. 15, but he made certain representations to the United States Department of Agriculture Farm Service Agency that Kurt Graham was the producer of that particular sod, *see* Id., Ex. 17. Finally, in his transaction concerning the Converted Collateral, Kurt Graham sold property in the name of Graham Farms, warranting that it was free of liens, that was secured by loans taken out in the name of the Debtors. *See* Case No. 07-40427, Dckt. No. 69, Ex. 10 (May 21, 2007); Case No. 07-40427, Dckt. No. 82, Ex. 4 (June 6, 2007).

Kurt Graham has also failed to disclose certain assets on his schedules, including a 40' Peanut Trailer; 60' LMC Sprayer; 6-Row Under-Furrow Strip-Till Rig; and Strip-Till Planter w/7100 Planters. In violation of the security agreements with the Bank, he sold the Converted Collateral without the Bank's consent. *See* Case No. 07-40427, Dckt. No. 68 (May 21, 2007) (testimony of Harry Sheppard, President and CEO of the Bank). He has failed to insure the Collateral as required and has not demonstrated the ability to profitably

farm in the event he is permitted to retain the Collateral. The Collateral is subject to depreciation through use over time and requires regular maintenance, the Bank does not have adequate protection for its interest in the Collateral, and it is further entitled to relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1).

### ORDER

Pursuant to the foregoing, IT IS THE ORDER OF THIS COURT that the Bank's Motion for Relief from the Automatic Stay is GRANTED with respect to the Collateral, so that the Bank may exercise all state law remedies to foreclose its interest in the Collateral, including foreclosure of its security interest in the Collateral by judicial or non-judicial means; sale of the Collateral pursuant to the Uniform Commercial Code or other applicable law; and application of the sale proceeds to the Debtors' indebtedness to the Bank secured by the Collateral, including reasonable attorneys' fees to the extent allowable under applicable non-bankruptcy law. The automatic stay is further modified so as to permit the Bank to send any and all notices required by Georgia law or its collateral documents.

IT IS FURTHER ORDERED that following foreclosure and upon compliance with state law, the Bank may file an unsecured deficiency claim, if applicable, with a copy served upon the Assistant United States Trustee, any case Trustee, Debtors, and Debtors' counsel.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the terms

of this Order shall apply as to these Debtors or any other party claiming a legal or equitable interest in the Collateral in this or any subsequent bankruptcy case filed by the Debtors or such other party.

_____
Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia
This 12th day of June, 2007.